The next argument is in Horizon Lines v. United States, Appeal 1075 from 2009. This case is based upon a grant of summary judgment. This Court's review of the evidence is de novo. A review of the record shows two things. One, that the government's case, based upon two emails, does not establish that the regulatory dry docking at Jurong in Singapore necessitated the layup at KSS in Indonesia. And two... Well, help me understand the background here. Did the owner have a definite start date with the dry dock company at Jurong? Your Honor, there is evidence in the record that the ship owner was aiming towards sometime in November, but the date... Let me rephrase the question. I was a little imprecise. On the day that the decision was made to lay over the vessel, did the vessel owner have a start date at Jurong? It did not have a start date at Jurong. So why doesn't that support the inference that the location and causation of the layover was to be close by whenever Jurong finally could say, we're ready to do the work on your vessel? Your Honor, the two decisions were independent of each other. Well, that's the issue in the case. We're trying to decide what caused what. Correct. And it looks to me like a reasonable inference that if Jurong couldn't give them a date, their license was expiring, they needed to get the work done, therefore, they needed to have the ship near the shipyard so that when they finally got a date, there would be no further delay because the ship would be right close by. Your Honor, the record evidence, these two emails actually show that the ship owner wanted to get the ship back in operation in the beginning of January. But it also made an independent decision by different people in the company to lay up the vessel because of commercial reasons. Today, there are many vessels laid up. Well, the court below found that this was a dual-purpose layup. It was partly because of not enough business, and it was partly because of the Jurong dry docking need. Your Honor. So the court below agreed with you that there were two purposes here, but I don't see that that necessarily negates the Jurong-related purpose. Right. We would dispute the fact that this was a dual-purpose expense. In fact, we would say this is an expense that is unrelated to repairs. So it's not an SL service dual-purpose like the dry docking. A dry docking is a place to put a ship, to work on a ship. You lift the ship up so you can do, primarily to do inspections, regulatory inspections. But during the time of dry docking, you may also do repairs. This is to be totally contrasted to a layup which is done to take the ship out of service and to protect it and preserve it. The only reason, a ship owner would not sit around for 83 days to wait a spot at a dry dock. They wouldn't have chose this dry dock or this shipyard, Jurong shipyard, if they had to wait for 83 days. They made a commercial decision which is independent of the fact that they had to inspect the vessel for regulatory compliance. They have to do that two times in five years. They planned that very well in advance. They plan the schedule for their dry dockings for all their vessels well in advance. In this case, they planned it probably around a year in advance. The decision to lay up a vessel is different. It's very reactive. It's reactive to the commercial market. It's the marketplace. Let me ask you this. Was the vessel authorized to haul cargo subsequent to September 25th? There is an ABS extension. The company requested a short extension, and they did get an extension to September 31st, I believe. 25th, I'm sorry. No, September 31st. Okay, right. But in any case, there is undisputed expert testimony saying that if Horizon Lines wanted to sail this ship and carry commercial cargo, it could have gotten an extension for six months. ABS automatically gives six-month extensions. Is it six months? I thought it was three months. Is it six? No, they get up to six months. That's automatic, right? It's called an administrative extension. But it's automatic. It's automatic. But all they had to do was request it. They didn't request it because they didn't want it, because they didn't want to sail the ship, because they didn't have the cargo. They did request an extension, but it was about a three-month extension. No, they got a very short extension. It wasn't even a month. The dates were the end of August. It would have been expired, and they got one until the end of September. So it was actually shy of a month. I guess they didn't need it. They didn't want it. But the point is they could have got it if they wanted to. In fact, the ship went into layup September 7th and could have sailed for three more weeks, but they didn't have the cargo. Your position, I guess, summarized is that the fact of the layup was unrelated to the repairs. The location of the layup, however, was related to the repairs. Correct, Your Honor. The fact of the layup was done – the decision was made by different people in the company. It was made for commercial reasons. It had nothing to do with regulatory inspections that required dry docking. It had nothing to do with repairs. And you say the location doesn't have anything to do with the expense, which would have been incurred wherever they laid the ship up. And therefore, there's no causal relationship between the expense and the repair. When you talk about the expense, you're talking about the expense of the layup. The expense of the layup. Right, correct. The expense of the layup has nothing to do with the repair. The layup of the dry docking have entirely different purposes. You said about the – Well, the location, though, which makes this a little tricky, is that there's no doubt, no conceivable ground for doubt, that the reason they laid up in Indonesia wasn't just, oh, my goodness, look, we're only a couple of miles away from that shipyard where we plan to do the repairs. That's exactly why they were there. Well, in a way, the fact that the layup occurred immediately prior to the dry docking is entirely coincidental. That is coincidental, that there was a drop in cargo volumes and they decided to pull one of these ships out of service. Now, on the other hand, yes, it's logical that the company plans. It does a lot of planning. If you're in the business of transporting cargo, you have to plan and you have to take into consideration logistics. Well, they wanted to take the ship down and lay it up so that all they had to do was tow it across the strait to Indonesia, right? And that's very convenient. It wouldn't have been so convenient to have to tow it from Charleston, South Carolina. Right, well, that's correct, but although they do tow vessels across oceans, but in any case... That would have been... They would have had to rent a whole new vessel. But there is no causal link to the repairs because... And really, if you're going to... This is not a dual-purpose case because the repairs did not necessitate the layup as the repairs necessitated the dry docking because you'd have to dry dock the vessel for certain repairs. You don't have to dry dock the vessel for all repairs, but you do have to dry dock it for certain repairs. You didn't have to lay it up. You didn't have to lay up the ship for the repairs. And also, ship owners don't lay up vessels for 83 days just to wait a slot at a dry docking. They take vessels out of service. Now, they may have picked this because of convenience, but they would have laid up this vessel irrespective of any repairs. What does it mean to lay up the vessel? What physically happens to the vessel? Well, Your Honor, well, they brought the... The ship is at the port at berth, and what they're doing is there's a guideline. The American Bureau of Shipping has guidelines for the surveys to ensure that everything's done properly. Things are shut down. Also, equipment has to be protected. There has to be proper humidity. In this case, it was in Indonesia, so you have to secure the vessel. It's almost like your house. If you had a winter house and you didn't go there. It's being muffled. Right. I didn't want to use it. And there are different kinds of layups. There's cold layups and hot layups. And this one was kind of a typical layup because we have testimony that layups went from 60 to a certain amount, 120 days, and this vessel was laid up for 83 days, which is consistent. So the costs that were assessed against you to the tune of half a million dollars, I guess, were the costs of doing these mothballing tasks? No. The mothballing was a very small fraction of that amount. To the extent Horizon Lines declares all the work that's done abroad for anything involving repairs, it pays the duty. But we're saying that this is not related to repairs. Right. But how much? I have the same question. Judge, how much was Horizon charged for the entire layup aspect of the repair? I'm going to get back to you on rebuttal on that because I don't know the exact amount. Ballpark? It's not a huge amount of money. Does the vessel owner have to rent space at some pier or KSS location? Is that the economic transaction? Well, they have to pay them. It's not a big cost. But there are costs associated with it in terms of mothballing the vessel, which is to protect the vessel. There's a point here that this is unconnected to repairs. It's not repair-related. What's happening, unfortunately, is a slippery slope. Everything's becoming a dual purpose or being considered to be repair-related. But this is strictly, totally unrelated to repairs. Do you want to save your remaining rebuttal time? Do you have three minutes? Yes, I will. Thank you very much, Your Honor. Thank you. Mr. Kenney. Do you agree that you're relying almost totally on two communications? I guess they're e-mails. Ms. Suarez said at least twice, maybe three times, that the government's whole case is relying on these two e-mails. Is that right? Your Honor, those are the two main aspects of our proof.  The e-mails are very telling, though. These are right from Horizon Line, explaining at the time why— I've read them, and read them over and over and over. In your view, apparently they're very clear. Not so apparent to me that they are clear enough to support summary judgment in the face of a declaration by a company official that there was no relationship of the repair to the layup period. Well, Your Honor, the two e-mails are taken in the context of also the, as you mentioned earlier, the inspection status of the vessel that was due on September 25th. It could no longer trade after that time. Without an extension. Without an extension, Your Honor. Which would have been automatic. Well, the fact is, in the record, that there is no extension. There was no extension granted. No, no, no, no. But are you contesting that if requested, up to six months of extension would be automatically granted? The— Come on. It's a yes or no question. Are you denying that the extensions are automatic? That is a statement. Yes, I would deny that extensions are automatic. However, that does not discount the fact that they didn't even apply for an extension. Well, of course not. Because in their view, they don't need it because they're not going to carry carbon. Your Honor, the e-mails detail the purpose of the—and we're not saying it's a sole purpose. Let me just highlight exactly what my problem is here so you can address it. If Chief Judge Rustani had conducted a bench trial and found as a fact that the testimony of the company official saying there was no relationship was not credible, then I think this would be a case where it would be quite easy to affirm. But, of course, on summary judgment, the trial judge is not allowed to make credibility assessments or weigh evidence. So I'm trying to figure out in the face of what looks like conflicting evidence, the company officials say there's no relationship. Two e-mails suggest that there might be a relationship. Why isn't this a case that needs a trial as opposed to summary judgment? Well, it does get down to whether this is a genuine issue of material fact. Well, of course. We know the standard. But on these two pieces of opposing evidence, why do they not merit a trial? A bold assertion that there's no connection between the two. It wasn't a bold assertion. It said there's no connection between the two because we had no business. We had no cargo to haul. And Judge Rustani addressed that. There are other causes that Judge Rustani found. But that wouldn't discount the cause that is addressed in the… How can she make findings on summary judgment? It's not necessarily a finding, Your Honor. You just called it a finding. I'm just using your word. Judge Rustani did not discount the fact that there were other causes. But there are multiple causes of this layout. And that's what Judge Rustani found, that for the company to come forward with evidence of another cause doesn't discount the fact that they had to wait for an opening at their chosen shipyard facility. And that is addressed in those two emails. Wait a minute. Ms. Juarez says they didn't have to wait, that no shipowner ever waits 83 days for the precise start date of the dry dock. Well, Your Honor, I think it's the record evidence of these two emails. It's clear that they had no start date for the Giron shipyard overhaul period. At the time, August 29th, they're changing their whole plan at this point. They were going to do a quick and dirty dry docking, as they called it, according to that August 29th email. Well, why do we care about short dry docking versus long dry docking? What does that have to do with the purpose of the layout? The only issue is, was the purpose of the layout tightly connected to repairs, or was it, as asserted by the affidavit of the company official, totally unrelated to the repairs? I think the emails that are at the time really show the purpose of the layout as being connected to being able to get into the repair yard. But is that the purpose for the layout, or the purpose for selecting Indonesia as the location of a layout that would have occurred anyway? Or at least put it this way, isn't there a material issue of fact as to whether the layout would have occurred anyway? It's the purpose of this period of time that they have to choose an area to await the shipyard. Now, that Horizon Line spent money on that to protect their vessel is an appropriate expense, but that means that that expense is caused by the time period that they have to await. Suppose that we accept, as at least a fact that is put into the record in a form that if it's material then there's a material dispute, that they would have laid up the vessel during the period between, let's say, September and December anyway. They chose Indonesia as a place to lay it up because of the convenience of the Jurong shipyard being just across the strait, but they would have laid it up anyway. Do you think that on those facts that then the layup cost is chargeable? It's according to the Sea-Land case, or the SL Service case, it's caused both. I mean, the same as... Let's make sure we're on the same page here. For me, this is the central issue in the case. I'm seeing layup expense which may be attributable to a cause entirely separate from the repair. That is to say, we have no business, we're going to lay the ship up. Now, if that expense is attributable to the lack of business, the decision as to where to lay the ship up seems to me not to be causally related to the repairs. It's simply, you've got a choice. You could lay up in Charleston, you could lay up in Hong Kong, you could lay up in Australia, you're going to lay up in Indonesia. Why is that a contributory vocation of the layup as opposed to the fact of the layup? Why is that a contributory cause? It contributed to the repairs. Yes, the location of the layup does also contribute to it because it needs to be very close to the Gerong shipyard because they want to be able to get to that ship when they have availability. And it also goes to the flexibility that Horizon wanted to give Gerong a flexible time period in order to, there's no set date for them to take the ship in. We're giving, Horizon gave Gerong a flexible time period to get it when you can get it. What was the flexible period? Is there, I could reflect what Gerong gave Horizon by way of a window? Well, according to the emails, it's any time between the time they put it in there as of those August 29th dates but we just need it back by January. I thought they said they were contemplating that the work would be done in December and the vessel would be back in operation in early January. That's quite different from saying all through the fall that they had to have it right next to the Gerong shipyard. Well, Your Honor, I think things have changed at Horizon as it was going. I mean, in December 2000, the record evidence J0200, they're sending out requests for quotations and they're talking about an expected start date of August 15th 01 for the Crusader dry docking. Now, as it gets towards that time, they're negotiating with Gerong and then we have the only other record evidence of that are the emails from August 29th. See, but I'm still having trouble. I think we're not talking about the same hypothetical or at least the same postulated facts. You say that, well, they had to have it waiting there because they didn't know when the repair would start. Well, that's your hypothesis, but their evidence is that they were going to lay it up anyway and therefore they're saying they didn't lay it up at all because of waiting for Gerong to be ready. I mean, presumably if they'd had plenty of business, they could have been cruising all around South Asia and Gerong gives them a call and then they scoot over there and they get right in. But there's no indication that there was a queue here, right, that they had to wait for? Well, Judge Bryson, I would disagree that there's no evidence of a queue or that there's a status of waiting. I mean, I think the Gerong shipyard says they will move the ship in the August 29th email, J203. Well, by a queue, let me be clear, that was an unclear reference. There's no suggestion that they had to be there waiting in that spot in line or they'd lose their place in line, right? I mean, they could have been cruising around Hong Kong to Malaysia to Australia to Borneo, whatever, and as soon as Gerong called, they could scoot over and put the boat in, right? There was no need for them to be laying up in order to get the repair, right? I would disagree with the first part of your question, I think, that, you know, on August 29th when they were considering something shorter, a quick and dirty dry dock, the record reflects that that could have been available to them, but they've changed their mind. They want to do a more extensive dry docking now, and now there's not the availability immediately, but they're going to have to wait, and they're going to have to wait until a time that Gerong can fit them in. Fine. So, yes, they're going to have to wait. Now, that's a cause of, that waiting time is a cause for that ship to be, to have to be in the area awaiting Gerong's… Yeah, but not laid up. It just needs to be close enough that it can get there in time, whatever the lead time would be.  You're right, Your Honor. It just has to be ready and available, which is basically what this layup is. It's ready and available. But it could be ready, hauling cargo, too. It cannot be ready, hauling cargo, too, because of the inspection period, the September 25th inspection. Which they could have, according to their facts, at least, unresolved by the trial court, they could have gotten extension. There's record evidence that they claim that they could have, but the fact is that they never did. And there's also… I wouldn't, I'd stop barking up that tree, because there's no… They have a very good reason for not asking for the further extension. They had no cargo to haul, so they weren't going to haul anything, so they didn't need the license. Your Honor, the judge below, Judge Rustani below, said that she credited the fact that there was no… As Verizon says, there was no cargo, there was a drop in cargo at that time, so it wasn't needed. But as another cause, not discounting that cause, but as another cause, it had to be there awaiting the availability of their chosen ship repair contractor. Says who? Says the emails. What language says that? That it has to be waiting there for 83 days? I didn't see any such language at all. You're reading an awful lot into that email, I think. Well, Your Honor, we have the two emails, plus we have their expert, Mr. Doherty. What is the language from either email that you think shows that they needed to be sitting right there for 83 days? In the August 29th email, that's J203, it says, We will then have Gerong move the ship undertow a few hours to their yard to fit her into a schedule that fits them. That, combined with their expert, Mr. Dolan, who testified that November 28th was the earliest that they could fit them in, and that's… How does that help you? If November 28th is the earliest, why does that suggest that a layup all through September and October and early November is necessary? Well, it's only after the fact that he says that. It says that was the earliest that they could fit them in. It's not saying that that was something that was known at the time. It turns out that that was the earliest that they could fit it in. What are the dates of the two emails again? They're both August 29th, Your Honor. Well, that's what I thought. They're the same day, two different people. True. And that's your whole case, those two August emails. Your Honor, these are admissions by horizon lines. Yeah, but the question is, what is it that they admitted? There's no doubt who it is or what the date is. The question is, what does it mean? What do the two messages mean? You say it means they had to stand by for 83 days. The other side says it doesn't mean any such thing. Your Honor, we're not saying it's the only cause. We're just saying it's one of the causes is them having to wait for a slot. How do we know that? From the two emails, the circumstances. What in the two emails says that? I submit what I noted in there, that the fact that we will have Gerong move the ship under tow to their yard to fit her into a schedule that fits them, that's taken in the context of the same email, which says that we're changing our plan from doing an immediate dry, a quick and dirty dry dock, and now we're going to do a more extensive one. So they're going to fit us in. They're going to now fit us in to do that extensive one. Yeah, okay, they're going to fit us in when they can do it. But so what? What does that prove about an 83-day layup? Well, Your Honor, that's what it turned out to be. That's what their own expert says. That was the earliest that it turned out they could get the vessel in. Gerong could get the vessel in. And if that's how it turned out, it's not something that really can be disputed. That's the given fact. No, except that your argument, it seems to me, would be a very compelling one if they had loads of business and they said to themselves, we really want Gerong to do this repair. They're really cheap and they do good work. And doggone it, we hate the idea of having to lay this boat up with all this business out there, but I guess that's what we've got to do in order to get that repair done at Gerong. If those were the facts, and that's sort of the way you're casting this as the facts, then I think you'd have a pretty good case, but that's not what the evidence, at least the disputed facts, show. They show that, at least according to Horizon, they were going to lay up the boat. That's where I keep bumping into that factual conflict and having a hard time getting over it. Let's say there was no lack of work, as you said, if they were working constantly. You're saying that I would have a great case, but if that is a cause, that shows that this is, that ship has to wait there. It is a cause. It's not the only cause. How do we know the ship has to wait there? It seems like you're assuming the result. The ship has to wait there. It has to be in the area. It has to be available to the... On what kind of notice? Excuse me, Your Honor? On how much notice? On enough notice to meet the shipyard schedule. I mean, they have to be available... The point is, what's the normal notice time? When a shipyard knows it's going to have an opening, it tells the vessel owner, have your boat here by such and such a date because that's the day we can begin working on it. What is that lead time that the vessel owner gets? Your Honor, I don't want to speculate on it. There's no evidence as to... You're asking us to agree that it has to be 83 days. I'm not saying you have to agree that it's 83 days. I'm just saying that's what it turned out to be in this case. That's what we know. That's what the record shows. In this case, it was one of the reasons. And like in Sealand, like the dry docking expense was... You keep saying in this case it's one of the reasons. That's the issue in the case. We're trying to decide if this was one of the reasons or whether this was not one of the reasons. So for you to just keep saying it was one of the reasons and I can see it in the emails doesn't help us. Well, let's assume that your evidence is compelling, that it indicates a dual purpose. How do you discount the evidence on the other side in a summary of judgment posture? That to me is a simple question. Your Honor, I think their evidence of saying other causes doesn't discount our... It's not just that they say there's an other cause. They say that the cause that you articulate is not the true cause. And they have evidence to support that. So how do you get to summary judgment? Your Honor, I don't believe that the assertion that they make was that it wasn't enough for the lower court to believe that that was a genuine issue. And I don't believe that this court should find that that's a genuine issue either. Why not? Because it's not discounting the fact that they had no start time, as you pointed out, with Horizon Special. That's not just the genuine issue. That's the central issue. I mean, that is the issue. I don't understand. But, Your Honor, the emails that we have here are compelling evidence. No, no question about it. And if I was deciding the case, I'd be with you. It mentions nothing about other causes. Now, the fact that there are other causes doesn't disprove a dual or multiple causes of the dry docking. And that's what Judge Rustani decided on. I thought a fair reading of the affidavit of the company official presented to oppose the two emails was that the cause was only the lack of business and not at all the repair. Now, maybe the guy's lying. I don't know. But that's what I understand he said. And if that's what he said, then how is that anything other than at 180 degrees the opposite of what you're saying the emails say? Well, Judge Michel, the fact that he doesn't include any details in that, he doesn't say that there's a basic start date that we had, that, you know, obviously this wasn't, we weren't waiting because, look, the start time was this time. It's just a general allegation. How can that create a genuine issue of fact when we have a purpose that is shown in the two emails and in Mr. Dolan's testimony? Look, if he can't back it up, if it's a lie at the trial and cross-examination, you'll rip him to bits. The only issue here is whether we get a trial or whether we do this based on a reading of two documents, the affidavit versus the pair of emails. Well, Your Honor, I submit that there is enough and that it really doesn't create a genuine issue according to the case law. Because it's too conclusory? It's an unsupported, conclusory statement. What do you mean unsupported? I'm not sure what you mean. There has to be a second witness that says, I agree there was no business out there because we have to automatically assume the first witness isn't reliable? No, Your Honor, because we're not, I'm not, I'm not saying, and Judge O'Sconnell wasn't saying that there was no, that the lack of business was not a cause. Judge O'Sconnell credited that, but just said that there was another cause also. Yeah, but the witness said there wasn't another cause. So it looks like he's disbelieving that part of his testimony, which he's entitled to do at a trial, but not on summary judgment. Let me ask you a question, change the facts of this case a little bit. Suppose that they decided we're going in for repairs and we hope they get to us quickly, but in any event that we don't have a lot of business so we plan to lay up the boat for some period of time. And sure enough, the repair shipyard was ready for them on day one. So they got towed right across the strait and went in for the repairs. And then, because their layup period was anticipated to be, let's say, three months, they laid up across the way in Indonesia for three months after the repairs were done. Would that layup be chargeable as part of the expensive repairs? No, I think that's a different circumstance. So you'd say no, that's not chargeable. Yes. Even though the reason they were laid up in Indonesia was because they had the repairs done in Singapore. Your Honor, the... So the location doesn't matter. It's not, no. The fact that the work was done at that point and there's no reason, there's no longer any reason having to do with waiting for the ship repair schedule. That's no longer a reason. So the only reason left is the lack of work. That would be an entirely different case than we have here. All right. Let me ask you one other variant on the facts here. I mean, I think we... Suppose that they had a date certain for the beginning of the repair, December 15th. They decided to lay up in Indonesia on September 5th, whenever it was, because they were going to lay it up somewhere. And this was convenient because they were just going to be really close to the place where they were going to get it fixed. But they had a date certain. Would you say... That's a different set of facts, Your Honor. Of course it is. That's why it's a hypothetical. But would you say in those different sets of facts, in that different set of facts, that there would be no causal relationship between the layup and the repairs? Your Honor, in our brief, we never tried to say that every layup was going to be a dutiable event. Come back to my case. And in that case where you're saying the vessel has a date certain to get into the repair yard, it also lacks work. So it's laying up in any event because it lacks work. And then it'll go to the place that has a date certain, and that's going to happen. Then there is no relationship. Okay. So really everything now, it seems, turns on the problem, the issue that there was lack of clarity as to when the repairs would start. The issue, yes, the issue is the flexibility that they wanted to give the shipyard to allow that to happen. And, you know, it's probably an economically great thing to do. But, you know, it's that flexibility that makes it an expense of the repair, not the only reason, but a reason. There could be other reasons, and Judge Rustani found that there were other reasons. So for those reasons, I believe that this Court should uphold the ruling below. Thank you. All right. Rebuttal. Yes. I think the fact that the government is focusing so much, arguing facts, highlights our point that summary judgment was not inappropriate, was inappropriate, excuse me. But I also wanted to point out that Horizon Lines offered testimony by three witnesses. One was an expert witness who talked about the significance of the deadline, the fact that a layup has a legitimate purpose, it's for commercial reasons, it's when you lack cargo. He said all the work that was done at layup was for the purpose of the layup and had no crossover effect. We also had the port engineer who testified about what was done at the layup, it was done for the purpose of the layup. We also had the superintendent of the vessel testify, and he testified to the fact that they don't lay up a vessel for 83 days for flexibility, that's not the case. But how about the point that we've been focusing in on, I think, in the course of the argument, that there was uncertainty as to when the repair work would be able to be started, and therefore it was important for the boat to be in a position and in a condition ready to go immediately into the repair. What evidence is there with respect to that either? Right, well there is evidence that they planned to dry dock the vessel sometime in November, and they did in fact dry dock the vessel sometime in November. The evidence does show in these two emails that they wanted to get the vessel back in service by January, beginning of January. One thing to note is ship owners dry dock vessels as short a period as possible. They want to get it back into service, okay? And layups are draconian measures. You only do that when you have no cargo. You want cargo, that's the way you make business. So whether it's a dry dock, you don't want to lay up a ship, and when you put your ship out of service for dry docking, for regulatory inspections, you want to do it for the shortest period of time. And so there is some evidence that the ship was to be dry docked sometime in November, but if the ship wasn't going to be needed, it could have been laid up afterwards. If there's no demand, the ship is laid up. The Horizon Line has three ships right now laid up because of the demand situation. So if it wasn't needed, it would have been taken out of service. And we do have testimony disputing this argumentation about them putting the ship there for flexibility purposes. Can you point me to what there was, or at least give me a general... Right. It's the testimony of Walcott Becker. I could probably find the page, but I'll probably fumble around here. That's all right. The name is Becker? Becker, B-E-C-K-E-R. Right. Okay. That's fine. Okay. Thank you, Your Honor. All right. We thank both counsel. The appeal is submitted. Thank you. All rise.